UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DRILLING CONSULTANTS, INC.,
WILLIAM B. ZIEGLER, WILLIAM
C. ZIEGLER, and SONYA P.
ZIEGLER,

    Plaintiffs,

v.                                      CASE NO: 8:10-cv-2873-T-23EAJ

FIRST MONTAUK SECURITIES
CORP., et al.,

    Defendants.
_____/

**ORDER**

Pacific Life Insurance Company sold to Drilling Consultants, Inc., a life insurance policy designed to fund the "Pendulum Plan," an intricate defined-benefit pension plan created, sold, and administered by a third-party. Funded totally by life insurance, the Pendulum Plan intended to provide a small business owner a considerable tax benefit by complying with 26 U.S.C. § 412(i). Months before the sale, the IRS announced at an actuarial trade conference an intent to scrutinize use of Section 412(i) plans funded totally by life insurance. The IRS believed that certain aggressive use constituted tax avoidance. Aware of the public announcement, Pacific Life suspected that the IRS might begin to investigate the Pendulum Plan, and Pacific Life began internal discussion about how to respond.

Pacific Life never informed the plaintiffs about the IRS's public statement or about potential scrutiny.  Instead, Pacific Life advised the plaintiffs repeatedly to consult an attorney or a tax adviser "for complete up-to-date information concerning federal and state laws."  The plaintiffs retained both a tax accountant and a tax attorney, each of whom reviewed the plan and the policy before purchase.  Seven years later, the IRS determined that the plaintiffs' plan, as administered, violated Section 412(i), and, therefore, that the plaintiffs had claimed an excessive tax deduction.  After settling with the IRS and paying an excise tax, the plaintiffs sue Pacific Life for fraud, negligent misrepresentation, and breach of contract arising from the sale of the contributing life insurance policy.  Pacific Life moves (Doc. 171) for summary judgment.

## BACKGROUND

A Section 412(i) plan is an employer-sponsored defined-benefit pension plan that provides a retirement and death benefit to participants.  Generally, a small business creates a trust to hold the plan's assets—life insurance and annuity policies—and the trust uses tax-deductible employer premiums to purchase the policies for the plan.  Section 412(i) exempts a qualified plan from requirements typically imposed on defined benefit plans, such as quarterly contributions, minimum capitalization, and IRS actuarial assumptions.[1]  Requiring careful design and

---

[1] *See Zarrella v. Pacific Life Ins. Co.*, 820 F. Supp. 2d 1371, 1373-74 (S.D. Fla. 2011) (Williams, J.).

sophisticated actuarial calculation, a qualified plan satisfies six criteria listed in the statute, 26 U.S.C. § 412(i).[2]  Central to this action, Section 412(i)(3) requires that the "benefits provided by the plan are equal to the benefits provided under each [insurance] contract at normal retirement age."

In 1999, Kenneth Hartstein and his company, Economic Concepts, Inc., designed and developed the "Pendulum Plan," a Section 412(i) plan designed to maximize tax deductions and funded exclusively with life insurance.[3]  Hartstein designed the Pendulum Plan to include one of two life insurance policies created and sold by Pacific Life competitors.  However, with rising demand for the Pendulum Plan, Pacific Life in 2001 created, with "very instrumental" assistance from Hartstein, the "Flex XII" life insurance policy, which was specially designed to fund Hartstein's Pendulum Plan.  Hartstein received from Pacific Life a commission for each Flex XII policy sold to fund a Pendulum Plan.

As Pacific Life was aware, plans funded exclusively with life insurance would receive scrutiny from the IRS.  During an October 28, 2002, conference held by the American Society of Pension Actuaries, the IRS's chief actuary addressed Section 412(i) plans and identified innovative practices that the IRS would scrutinize as

---

[2] The Pension Protection Act of 2006, 120 Stat. 780, 820–826, Pub. L. No. 109–280, re-codified Section 412(i) at Section 412(e)(3) without material alteration. To accord with industry parlance, this order uses the former statute, 26 U.S.C. § 412(i).

[3] The plaintiffs receive a favorable construction of the evidence and the benefit of each available, reasonable inference. *Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006).

"abusive."[4] Hartstein understood the chief actuary's comments to target the Pendulum Plan, and Pacific Life management began to consider the IRS's warning. Pacific Life concluded that the Pendulum Plan raised "plan permanency issues;"[5] considered removing the Flex XII from the market; began designing the "Flex Protector"—an insurance policy designed for a plan with life insurance contributing no more than half of the plan's assets; and began amending disclosures disseminated to purchasers. In November, 2002, Pacific Life decided to require a purchaser to sign

---

[4] The details of an "abusive" Section 412(i) plan are explained in a December 2, 2011, order:

> An abusive Section 412(i) plan involves the employer's contributing abnormally large and tax-deductible amounts of cash to the trust, while claiming an income tax deduction for each contribution. The trustee uses the cash to pay a high premium on an insurance policy. As a consequence of the employer's large cash contribution and resulting payment of the high insurance premium, the policy accumulates over a few years an impermissibly large cash reserve. However, as sold, the policy carries a high "surrender charge," the amount forfeited if the trust pre-maturely "cashes out" of the policy. The surrender charge disguises and suppresses the value of the policy's cash reserve, and after five to seven years a participant may purchase the policy from the trust for the "surrender value"—the value of the policy's cash reserve reduced by the surrender charge.
>
> The purchase is tax-free, and the surrender charge gradually decreases to zero within a few years. Therefore, a so-called "springing" cash value policy increases dramatically in value, which allows the purchaser to obtain a tax-free loan against the increased cash value of the insurance policy. The high cash contribution and the high surrender charge—which result in a "disconnection between the benefit[] provided by the insurance [policy] and the benefit[] promised under the defined benefit pension plan being funded by the [policy]"—distinguishes an abusive Section 412(i) plan from a traditional Section 412(i) plan.

(Doc. 128 at 2–3)

[5] *See* Doc. 311 at 3.

- 4 -

the disclosure if the purchaser initially applied after January 1, 2003, or initially applied before January 1, 2003, and paid on or after April 1, 2003.

The plaintiffs William C. ("Bill") Ziegler and Sonya P. Ziegler (collectively the "Zieglers") owned Drilling Consultants, Inc. ("DCI"), a well-drilling company contracting in the public and private sector. The Zieglers' son, William B. ("Bart") Ziegler, also a plaintiff, began Southeast Drilling Services, Inc., also a well-drilling contractor. In 1995, the family informally consolidated the companies into Southeast Drilling Services but chose not to dissolve DCI, which eventually purchased the plan.

In August, 2002, Bart Ziegler was approached by his financial adviser, Anthony Lombardi, about planning for retirement. Lombardi introduced the Zieglers to Donald Haskell, Lombardi's business partner. Each an "independent" insurance broker, Lombardi and Haskell sold insurance policies, including Pacific Life policies sold on commission. The three discussed retirement options, including a Section 412(i) plan. Unfamiliar with the details of sophisticated pension plans, Lombardi and Haskell in September, 2002, introduced the Zieglers to Hartstein at Economic Concepts.

During the next five months, "numerous conversations" were held among two or more of Haskell, Lombardi, Hartstein, and the Zieglers concerning the mechanics of Section 412(i) and the Pendulum Plan. Despite the Zieglers's questioning about "any reason" the Zieglers should not purchase the Flex XII, none of the three salesmen disclosed IRS or industry criticism of the Pendulum Plan or the Flex XII.

Meanwhile, the Zieglers consulted their accountant, Dan Haya, and retained a tax attorney, Chris Norman. The Zieglers sent Norman the plan proposal and the legal opinion letters, and Norman participated in at least one conference call among Bill Ziegler, Bart Ziegler, and Hartstein. According to Hartstein, Norman "asked many questions about springing cash value policies," and Hartstein explained many details, including "why [he used] the net surrender value for funding purposes." (Doc. 172-2 at 27) Also, the Zieglers contacted Johnny Adcock and the Adcock Financial Group, a financial planning and asset management firm, and requested a Section 412(i) plan proposal.

After four months of discussion, research, and investigation, the Zieglers decided in December, 2002, to establish a Pendulum Plan for DCI. On December 24, 2002, DCI signed Economic Concepts's "Disclosure and Acknowledgment" form, which advises DCI that Economic Concepts's sales presentations, "should not be relied on as tax advice" and instructs DCI to "seek the advice of [DCI's] own tax [or] legal advisor."

In January, 2003, DCI completed applications to purchase Pacific Life's Flex XII life insurance policy. DCI signed a Pacific Life "revised policy illustration" that states, "Neither Pacific Life nor its representatives offer legal or tax advice. Consult your attorney or tax advisor for complete up-to-date information concerning federal and state laws in this area." (Doc. 172-4 at 35) Additionally, the revised illustration states:

> Pacific Life makes no determination or representation as to whether the Flex XII and Quest II contracts, when used together, automatically exempt[] a qualified plan from minimum funding requirements, or meet[] any other requirements of [Internal Revenue Code] Section 412(i). Any such determination, like all other qualified plan design and administration issues, must be made by the qualified plan administrator, plan trustee, or the plan's other legal or tax advisors.
>
> . . .
>
> By signing below, you are stating that you have obtained from your independent tax and legal advisors whatever advice you deem necessary or appropriate concerning your qualified plan's risks and benefits.

(Doc. 172-4 at 37) The revised illustration continues:

> It is Pacific Life's understanding that certain risks may increase for 412(i) plans where the percentage of contribution allocated to life insurance exceeds fifty percent of the total annual plan contribution. These increased risks may include the following:
>
> - Growth of policy cash values may result in overfunding of plan benefits.
>
> - Receipt of a policy death benefit greater than allowed under incidental benefit limitations may result in overfunding of plan benefits.
>
> - Overfunding of plan benefits may subject plan assets to income and excise tax.
>
> - Purchasing substantial life insurance may require distribution of the policy, and may raise issues of plan permanence.
>
> - Enhanced tax benefits may lead to IRS Scrutiny.

(Doc. 172-4 at 34–35) DCI signed Pacific Life's "Qualified Plan Disclosure Form," which states in the heading in bold capital letters, "Pacific Life Provides No Qualified Plan Administration Services." The disclosure continues:

> Pacific Life does not provide Plan Administrative Services, either directly or indirectly, whether fiduciary or otherwise. [Pacific Life's] role is limited solely to providing you with, and servicing, your life insurance policies and annuity contracts. If you would like to obtain Plan Administrative Services in connection with your qualified plan, you must obtain those services from a qualified third party of your choice.

(Doc. 172-4 at 21) Pacific Life's "Internal Revenue Code 412(i) Life Insurance Rider" states as headings (1) "The Policy Is Designed To Fund The Benefits You Report To Us," (2) "You Need To Tell Us About Any Possible Over-funding," and (3) "If You Notify Us Of Over-funding, We Will Make Adjustments." (Doc. 172-6 at 22) Additionally, DCI signed a "Plan Information Document, which states:

> The undersigned Employer declares that the type and amount of policies/contracts applied for are compatible with the terms and provisions of its qualified Trust/Plan, that the trustee(s) is/are authorized under the provisions of the Trust/Plan to apply for such policies/contracts and that the Employer fully understands that [Pacific Life] is not responsible for the plan administration or submitting it to the IRS for a determination of its qualification and that the only obligations and liabilities of PL related in any way to policies/contracts issued are those set forth in the policies/contracts.

(Doc. 172-4 at 22)

In 2006, the IRS audited DCI's tax returns for 2003 through 2007 and determined that the plan was structured to provide annual retirement benefits in excess of the statutory limit. DCI continued paying into the plan until September,

- 8 -

2007, when the IRS informed DCI that its plan failed to comply with Section 412(i). In August, 2009, DCI entered with the IRS a "Closing Agreement on Final Determination" (Doc. 200-1 at 11–13), which obligated the plaintiffs to pay an excise tax of $120,046, and, according to the fourth amended complaint (Doc. 229 at 16), "other state and federal corporate and income taxes, interest[,] and penalties" combining over $2,000,000.

## DISCUSSION

Pacific Life first argues that the applicable limitation bars each claim. Section 95.031, Florida Statutes, states that "[a] cause of action accrues when the last element constituting the cause of action occurs." *See also City of Riviera Beach v. Reed*, 987 So. 2d 168, 170 (Fla. 4th DCA 2008) ("The limitations period begins to run when the action may be brought.") (internal quotations omitted). Section 95.11(3) establishes a four-year limitation for each asserted claim, each of which requires resulting injury or damage. DCI filed this action in state court on November 9, 2010, and no evidence establishes that DCI suffered injury before November 9, 2006.

Fraud requires (1) a false statement or omission of material fact, (2) a knowledge of the statement's falsity, (3) an intent to induce reliance, and (4) an injury resulting from reliance. *Ward v. Atlantic Sec. Bank*, 777 So. 2d 1144, 1146 (Fla. 3d DCA 2001) (citing *Lance v. Wade*, 457 So. 2d 1008, 1011 (Fla. 1984)). DCI relies primarily on an omission or an alleged fraudulent concealment—Pacific Life's failure to inform DCI that the IRS might begin scrutinizing defined-benefit pension plans

similar in structure to the Pendulum Plan if administered in a particular fashion. However, if the parties deal in an "arm's length" transaction and if each party possesses an equal opportunity to discover the material information through diligence, neither party owes a duty to disclose. *Robson Link & Co. v. Leedy Wheeler & Co.*, 18 So. 2d 523, 614 (Fla. 1944); *Ramel v. Chasebrook Const. Co.*, 135 So. 2d 876, 879 (Fla. 2d DCA 1962); *Taylor v. Am. Honda Motor Co., Inc.*, 555 F. Supp. 59, 64 (M.D. Fla. 1982) (Scott, J.). Additionally, neither an opinion nor a promise of future action (or an omission about a future event) supports a claim of fraud or negligent misrepresentation. *Rothis v. M & I Marshall & Isley Bank*, No. 8:10-cv-446-T-23EAJ, 2010 WL 3893960, *5 (M.D. Fla. 2010). However, if "'the person expressing the opinion is one having superior knowledge of the subject of the statement and the plaintiff can show that the . . . person knew or should have known from facts in his or her possession that the statement was false,'" an opinion on a future event may serve as the basis for a fraud or negligent misrepresentation claim. *Zarrella v. Pacific Life Ins. Co.*, 755 F. Supp. 2d 1218, 1224 (S.D. Fla. 2010) (citing *Mejia v. Jurich*, 781 So. 2d 1175, 1177 (Fla. 3d DCA 2001)).

Announced at an actuarial trade conference, the IRS's public expression of an intent to begin scrutinizing Section 412(i) plans fully funded with life insurance and administered as a "tax avoidance scheme" is a fact discoverable by DCI and DCI's accountant and tax attorney, each of whom investigated the proposal before DCI's purchase. DCI presents no evidence of a material fact within the exclusive

knowledge of Pacific Life, Lombardi, Haskell, and Hartstein and not publicly available to an informed and diligent observer. Pacific Life's allegations of fraudulent omission fail on this basis alone.

Further, the propriety of the plan ultimately depended on the future administration by the trustee, DCI, and the administrator, Economic Concepts, and the future regulation by the IRS. Attempting to establish "superior knowledge," DCI relies on Pacific Life documents that reveal an internal research effort regarding the propriety of the Flex XII and the protection from potential liability. The conversation exhibits merely a common and responsible reaction by a corporation under the circumstance and evidences neither fraud nor intent to defraud. Additionally, the IRS's publicly stated intent to scrutinize plans administered similarly to Hartstein's Pendulum Plan is neither a statement that DCI's plan is a tax avoidance scheme nor a statement that the Pendulum Plan and Flex XII is a tax avoidance scheme nor, even, a statement that the Pendulum Plan and Flex XII "raise concerns." DCI presents no evidence that the IRS at that time had levied an excise tax on an employer using the plan, no evidence that the IRS or Pacific Life concluded the plan was a tax avoidance scheme, and no evidence that Pacific Life expected DCI's plan (or any plan) to fail. Pacific Life possessed no knowledge "superior" to that available to the public or ascertainable by DCI or DCI's informed advisers.

However, DCI provides evidence of a positive, false statement about an existing material fact. According to Bart Ziegler's deposition and affidavit and Bill Ziegler's deposition, Hartstein, Haskell, and Lombardi each told DCI that the Pendulum Plan and the Flex XII policy "was approved by the IRS." (Doc. 198-2 at 3; Doc. 199-1 at 15; Doc. 200-1 at 4) With the plan and policy having not been "approved by the IRS," whether the statement is a misrepresentation about an existing material fact presents a genuine issue of material fact.

Because Florida charges a recipient of a misrepresentation with no duty to investigate, "[j]ustifiable reliance is not a necessary element of fraudulent misrepresentation." *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010). However, a recipient may not rely on a representation if "'he knows the representation to be false or its falsity is obvious to him.'" *Butler*, 44 So. 3d at 105 (quoting *Besett v. Basnett*, 389 So. 2d 995, 998 (Fla. 1980)). A jury must decide whether DCI knew the falsity of the representation in light of each disclosure and the review of its advisers.[6]

Unlike fraud, negligent misrepresentation requires a reasonable investigation. Although fraud "prohibit[s] one who purposely uses false information to induce another into a transaction from profiting from such wrongdoing. . . , a recipient of an

---

[6] Attempting to establish other positive misrepresentations, DCI cites Bill Ziegler's deposition. (Doc. 199-1 at 38) During the deposition, Haskell's attorney asks Bill Ziegler to review the complaint and asks "what specifically did [Haskell] represent to you?" Bill Ziegler responds, "He represented the whole plan that he presented to us, just as we bought it, that it would comply, that it met the 412(i) requirements." Despite numerous follow-up questions by Haskell's attorney, Bill Ziegler provides no other detail. Standing alone, a vague statement by the plaintiff that a "[mis]representation" occurred evidences virtually nothing and fails to create a genuine issue of fact.

erroneous[, negligent] representation cannot 'hide behind the unintentional negligence of the misrepresenter when the recipient is likewise negligent in failing to discover the error.'" *Butler*, 44 So. 3d at 105 (quoting *Gilchrist Timber Co. v. ITT Rayonier, Inc.*, 696 So. 2d 334, 336–37 (Fla. 1997)).

As outlined above, DCI executed a "revised illustration," a "qualified plan disclosure form," and a "plan information document" advising DCI that Pacific Life provides no tax advice; that DCI should obtain a third-party plan administrator, an accountant, and a tax attorney; and that Pacific Life is not responsible for submitting the plan to the IRS for approval.[7] In light of these disclosures, reliance on a previous verbal statement from Pacific Life that the plan was "pre-approved by the IRS" or reliance on Pacific Life for tax advice is unreasonable as a matter of law. *Zarrella v. Pacific Life Ins. Co.*, 755 F. Supp. 2d 1218, 1225 (S.D. Fla. 2010) (holding that the plaintiffs' executing a Pacific Life policy rider and revised illustration, each containing a disclosure, negated an argument of justifiable reliance).

Finally, Pacific Life attacks the breach of contract claim. A May 27, 2011, order (Doc. 61) dismisses DCI's breach of contract claim and explains:

---

[7] In an affidavit, Bart Ziegler states that each time Haskell or Lombardi presented a revised illustration, neither "would indicate" that Pacific Life inserted additional disclosures. Instead, Haskell or Lombardi "would indicate" that the revised illustration "was essentially the same as prior versions . . . with the exception of [] revised financial calculations." (Doc. 200-1 at 5) Although a self-serving affidavit may support a material fact, the affidavit's bald, generic, and unhelpful assertion that Haskell and Lombardi "would indicate" provides neither a time, manner, or means of the alleged deception nor even the identity of the alleged transgressor. Standing alone, the affidavit's vague and conclusory language fails to create a genuine issue. In any event, DCI fails to contest the execution of the "Qualified Plan Disclosure Form" and the "Plan Information Document," which alone extinguish justifiable reliance.

> The allegations without more fail to show that Pacific Life 'contracted' to provide a plan that complied with Section 412(i). Rather, the allegations show merely that Pacific Life 'intended' to provide a policy that satisfied the applicable tax requirement. The language of the rider appears precatory and indicative of no duty on the part of Pacific Life.

DCI amended the complaint but identifies neither new pertinent facts nor helpful evidentiary support. For the reasons stated in both the May 27th order and Pacific Life's motion for summary judgment, the breach of contract claim fails as a matter of law. *See also Zarrella v. Pacific Life Insurance Co.*, 820 F. Supp. 2d 1371, 1375–76 (S.D. Fla. 2011).

## CONCLUSION

Pacific Life's motion for summary judgment (Doc. 171) is **GRANTED IN PART** and **DENIED IN PART**. The clerk is directed to enter judgment on the breach of contract claim (Count I) and the negligent misrepresentation claim (Count III) in favor of Pacific Life and against each plaintiff. The fraud claim remains, but the plaintiffs must prove a positive and identifiable false statement of material and existing fact, the falsity of which was unknown to the plaintiffs.

ORDERED in Tampa, Florida, on August 14, 2012.

_____
STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE